IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

BOBBIE MCCOY                                                                    PLAINTIFF

v.                              Case No. 4:17-cv-00002-KGB

DR. BEN S. CARSON SR., In His
Official Capacity as SECRETARY,
OF THE UNITED STATES DEPARTMENT
OF HOUSING AND URBAN DEVELOPMENT                              DEFENDANT

## OPINION AND ORDER

Before the Court is a motion for summary judgment filed by defendant Dr. Ben S. Carson, Sr., in his official capacity as Secretary of the United States Department of Housing and Urban Development ("HUD") (Dkt. No. 17). Plaintiff Bobbie McCoy has filed a response to the motion (Dkt. No. 23). Secretary Carson has filed a reply to Mr. McCoy's response (Dkt. No. 26). For the following reasons, the Court grants Secretary Carson's motion for summary judgment (Dkt. No. 17).

### I.        Factual Background

Mr. McCoy brings this civil rights action pursuant to Title VII of the Civil Rights of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 (Dkt. No. 2, at 1). Mr. McCoy seeks damages against Secretary Carson for the alleged unlawful discriminatory employment practices that Mr. McCoy has been subjected to, all on account of his race, handicapping condition, and in retaliation for opposing unlawful discriminatory employment practices (*Id.*).[1] Specifically, Mr. McCoy seeks a declaration that he has been subjected to unlawful discriminatory practices; reinstatement and back pay;

---

[1] Mr. McCoy, through his counsel, confirmed that he is not pursuing sex discrimination or hostile work environment claims in this lawsuit (Dkt. No. 18, at 4 n.1-2).

compensatory and punitive damages; the costs of prosecuting this action; attorney's fees; and all other equitable, legal, and just relief (*Id.*, at 12-13).

Mr. McCoy, an African-American male, began working for HUD in 1995 as the State Coordinator, and he held this position for two years (Dkt. No. 24, ¶¶ 1, 5). The position was renamed Senior Community Building, and every State Coordinator nationwide had to reapply for this position (*Id.*, ¶ 2). Mr. McCoy was not selected for the job when he reapplied (*Id.*). He held various other positions associated with HUD (*Id.*, ¶ 3). Mr. McCoy applied for the Field Office Director position that was held by Bessie Jackson, an African-American female, but he was not selected (Dkt. No. 2, ¶¶ 10-11; Dkt. No. 24, ¶ 3).

At the time that this cause of action arose, Mr. McCoy worked as an Operations Specialist, GS-15, on Ms. Jackson's staff in the Little Rock Field Office (Dkt. No. 2, ¶ 9; Dkt. No. 24, ¶ 4). An Operations Specialist assists the Field Office Director in ensuring the operational functions of the office are carried out in an effective manner and that HUD programs are administered properly (Dkt. No. 24, ¶ 4). Mr. McCoy held this job until he retired from HUD on September 29, 2010 (*Id.*). Alice Rufus, an African-American woman, and Steve Coop, a Caucasian male, were Operations Specialists, GS-13, and were also supervised by Ms. Jackson (*Id.*, ¶¶ 4-5).

Ms. Jackson worked as the Field Office Director for HUD from March 2002 to March 2008 (*Id.*, ¶ 6). In this position, Ms. Jackson maintained responsibility for the overall administration of the HUD office in Arkansas and ensured the effective delivery of HUD's services to customers (*Id.*). She was responsible for representing and speaking for the Secretary of HUD with Congressional delegations, governors, mayors, local leaders, state legislators, representatives of the industry, and public and private interest groups (*Id.*). During the time in question, Ms. Jackson served as Mr. McCoy's immediate supervisor (*Id.*, ¶ 9). Ms. Jackson's immediate supervisor was

Cynthia Leon, Regional Director, Region VI, Regional Office, Fort Worth, Texas (*Id.*). On March 16, 2008, Ms. Jackson became the Supervisory Operations Officer for Regional VI, HUD, in Fort Worth, Texas, and John Munday became the Acting Little Rock Field Office Director (*Id.*, ¶ 10). Ms. Jackson retired on September 30, 2010, after working for HUD for approximately 25 years (*Id.*, ¶ 11).

As Operations Specialist, some of Mr. McCoy's duties included: compiling information received into a Weekly Report to Regional Director; compiling information received electronically from program divisions into a single Quarterly Management Report for submission to the Regional Office; researching and preparing correspondence; and reviewing correspondence prepared by others in response to inquiries from Congressional and other HUD customers (*Id.*, ¶ 12). In addition, on an as needed basis, Mr. McCoy prepared briefing and other reports from information generally provided electronically by program divisions and/or otherwise generally available electronically from other sources, such as Congressional web pages, HUD web pages, and the like (*Id.*). Mr. McCoy also represented HUD in, and coordinated HUD's conduct and involvement in, meetings and events, among other things (*Id.*). As Program Liaison, Mr. McCoy kept the Field Office Director up to date on the status of activities, issues, and concerns involving activities being implemented by assigned program divisions and coordinated responses to media inquiries with the Regional Public Affairs Office (*Id.*).

On February 24, 2003, Ms. Jackson issued a Letter of Counseling to Mr. McCoy to put him on notice of his duties and responsibilities as well as her expectations of his conduct (*Id.*, ¶ 34).

On April 28, 2003, because of back problems, Mr. McCoy submitted an accommodation request for a desk chair with lumbar support and an adjustment computer or keyboard stand (*Id.*, ¶ 15). The request was the result of a workstation evaluation (*Id.*). Mr. McCoy included a picture

of a chair he was requesting but stated that if some other chair was determined to be more appropriate his accommodation request could be amended (*Id.*). Ms. Jackson approved his request in full, and Mr. McCoy received an ergonomic chair and some type of keyboard tray (*Id.*, ¶¶ 15-16). Mr. McCoy asserts that beginning in late 2005 he began to experience pain and tremors in his right arm and hand, as well as pain and numbness in his left hand (Dkt. No. 2, ¶ 12). On August 15, 2006, Mr. McCoy submitted an accommodation request for a replacement chair because the left armrest on his chair broke (Dkt. No. 24, ¶ 17). Instead of purchasing a replacement chair, a replacement arm was ordered, and his ergonomic chair was repaired (*Id.*). Mr. McCoy verified with Ms. Jackson that his chair was repaired on October 4, 2006 (*Id.*).

On March 20, 2007, Mr. McCoy submitted an accommodation request that stated the following: "My Doctor has instructed me to 'limit' my time and usage on the computer for the next 30 days through April 12, [2007], because of pain and tremors in my hands, particularly the right hand. They have gotten progressively worse over the past 18 months. A treatment plan is expected on 4-13-07." (*Id.*, ¶ 18). Mr. McCoy provided a certificate to return to work from Dr. Cain, which diagnosed Mr. McCoy with tremor of right upper extremity (*Id.*). Dr. Cain stated that Mr. McCoy had been under his care since March 15, 2007 (*Id.*).

Ms. Jackson received the accommodation request on March 21, 2007, assessed Mr. McCoy's essential job functions, and determined that about 90% to 95% of his work product required use of the computer (*Id.*, ¶ 19). Ms. Jackson engaged in interactive communications with Mr. McCoy to discuss the problem, which affected his ability to perform the essential functions of his job, and to determine an appropriate reasonable accommodation that would enable him to perform those functions (*Id.*). Mr. McCoy was unable to specify or describe the accommodation that may be available to allow him to perform his essential functions (*Id.*, ¶ 20). A suggestion for

a reasonable accommodation was typing assistance, but the Little Rock Field Office did not have secretaries or other clerical support who could be made available to assist Mr. McCoy (*Id.*). Due to lack of knowledge of the expense and availability of appropriate reasonable accommodation to meet Mr. McCoy's needs, Ms. Jackson was unable to assess adequately the determining factors that constitute undue hardship or impact on the agency (*Id.*). Ms. Jackson sought assistance from her supervisor, Ms. Leon, and HUD Employee Assistant Program and Disability Program Manager Deborah Rizzo for evaluation and determination (*Id.*).

On May 14, 2007, Ms. Jackson issued an Official Reprimand to Mr. McCoy for failure or refusal to follow instructions and failure to perform assigned duties. In the Official Reprimand, Ms. Jackson warned Mr. McCoy that any further acts of misconduct may result in a proposal to take disciplinary action against him, up to and including removal from Federal Service (*Id.*, ¶ 34).

Ms. Rizzo approved Mr. McCoy's accommodation request in part on May 16, 2007 (*Id.*, ¶ 21). Dr. Sylvie Cohen, Occupational Medicine Consultant, Department of Health and Human Services ("HHS"), was asked to review Mr. McCoy's medical documentation and recommend an accommodation (*Id.*). Dr. Cohen reported that Mr. McCoy's treating physicians, Dr. Cain and Dr. Michael Chesser, felt that voice recognition software would adequately address his lack of fine motor skills at this time while being able to perform the essential functions of his job (Dkt. No. 2, ¶ 17; Dkt. No. 24, ¶ 21). Based on this information, Dr. Cohen recommended the use of voice recognition software with Mr. McCoy's computer to minimize his hand use (Dkt. No. 24, ¶ 21). Dragon Naturally Speaking voice recognition software, training materials, a headset, a track ball, and an ergonomic keyboard were requested for Mr. McCoy and were received mid-May (*Id.*).

Mr. McCoy was diagnosed with left entrapment ulnar nerve, cubital tunnel syndrome, and dystonia in his right hand on April 26, 2007, by Dr. S. Berry Thompson (Dkt. No. 2, ¶ 18; Dkt.

No. 24, ¶ 22). Mr. McCoy ultimately had surgeries on both hands, with one surgery on January 18, 2008, and a second surgery on April 9, 2008 (Dkt. Nos. 18-1, at 24; 24, ¶ 22). On June 11, 2007, Mr. McCoy submitted an accommodation request stating that his doctors had limited his use of the computer to not more than two and a half hours per day (Dkt. No. 24, ¶ 23). He requested that his workstation be evaluated, so his doctor could fully evaluate and treat his medical conditions (*Id.*). Mr. McCoy had previously written Ms. Rizzo on May 14, 2007, requesting that a professional evaluate his workstation because his new keyboard and mouse may be doing more harm than good (*Id.*). Ms. Jackson engaged in interactive communications with Mr. McCoy to discuss the problem that affected his ability to perform the essential functions of his job and to determine an appropriate reasonable accommodation that would enable him to perform these functions (*Id.*, ¶ 24). Ms. Jackson submitted Mr. McCoy's accommodation request to Ms. Rizzo at HUD headquarters on June 21, 2007 (*Id.*).

Mr. McCoy filed a complaint with the United States Department of Labor, Occupation & Safety & Health Administration ("OSHA") on June 18, 2007, requesting assistance in requiring HUD to inspect and evaluate his workstation (*Id.*, ¶ 25). On June 18, 2007, the Little Rock HUD Field Office received a notice of safety and/or health hazards from OSHA regarding employees receiving pain and tremors in arms and hands from apparent computer operations (*Id.*). The letter stated that OSHA had not determined whether the hazards as alleged existed and that the letter was not a citation or notification of a proposed penalty (*Id.*). Ms. Jackson was further informed that no inspection was planned at that time but that the agency should investigate, take corrective actions, and respond by June 26, 2007 (*Id.*). Ms. Jackson forwarded the OSHA notice to Carol People at the Administrative Service Center for investigation and appropriate action (*Id.*).

In July 2007, the Little Rock HUD Field Office moved to another floor (*Id.*, ¶ 26). As part of the move, Mr. McCoy and all employees received a new ergonomic chair (*Id.*). The chair was a Life chair which has several features, including: adjustable lumbar support, adjustable arms, adjustable seat height and depth, and tension preference selector (*Id.*). After the move, Ms. Jackson was the only person with an office (*Id.*). Mr. McCoy and the other employees were in cubicles (*Id.*). An ergonomic evaluation of Mr. McCoy's workstation was performed by Federal Occupational Health on September 24, 2007 (*Id.*, ¶ 27). On October 4, 2007, Ms. Rizzo wrote Mr. McCoy a memorandum providing him with a summary of the following recommendations made from the ergonomic evaluation: determine if Mr. McCoy could be assigned to another job not requiring the use of a computer or the need to write; require Mr. McCoy to use the voice recognition program already installed on his computer; replace the current mouse laptop keyboard with a RollerMouse Pro Workstation; provide large barreled gel pens; eliminate the use of the current chair and replace it with the modern chair already in Mr. McCoy's cubicle; and require Mr. McCoy not to place his left elbow directly on the rest by adjusting it so that the bottom of the forearm contacts the rest and his arm is kept as straight as possible (*Id.*).

On September 14, 2007, Ms. Jackson issued a proposal to suspend Mr. McCoy for five days for failure to carry out instructions within a reasonable timeframe and inattention to duty (*Id.*, ¶ 35). There were seven specifications on the failure to carry out instructions within reasonable timeframe and six specifications on the inattention to duty charge (*Id.*). Specifications four through seven were about job assignments or instructions given in January 2007 (*Id.*). Mr. McCoy submitted a response to Ms. Jackson's suspension proposal (*Id.*). On November 5, 2007, after reviewing Ms. Jackson's proposal and Mr. McCoy's response, Louis Ybarra, Supervisory Operations Officer, issued a decision to suspend Mr. McCoy for five days (Dkt. No. 18-2, at 83-

86; 24, ¶ 35). Mr. Ybarra found that all of Ms. Jackson's specifications in her proposal to suspend Mr. McCoy were supported except for specifications four and six for the inattention to duty charge (Dkt. No. 24, ¶ 35).

Secretary Carson alleges that Ms. Jackson gave Mr. McCoy an overall fully successful rating on his Performance Appraisal for the period September 1, 2006, to September 30, 2007 (Dkt. Nos. 18-2, at 87; 24, ¶ 36). Secretary Carson claims that Mr. McCoy also received fully successful on the five critical elements and that Deputy Regional Director C. Donald Babers approved Mr. McCoy's performance appraisal (Dkt. Nos. 18-2, at 87; 24, ¶ 36). Secretary Carson claims that Mr. McCoy received fully successful overall ratings in his Performance Appraisals for FY 2006, 2005, and 2004 (Dkt. No. 24, ¶ 36). Per Secretary Carson, in FY 2006, Mr. McCoy received successful ratings on four critical elements, and Director Babers also approved these performance appraisals (*Id.*). Secretary Carson claims that Mr. Coop received an overall highly successful rating in FY 2006 and an overall outstanding rating FY 2007 (*Id.*). With no citation to record evidence, Mr. McCoy denies these claims (*Id.*).

Secretary Carson claims that on October 10, 2007, Ms. Rizzo sent Sharon Robinson, Chief at the Staffing and Classification Branch, an email requesting that a program-wide search for a position at or below the GS-15, non-supervisory level in the Little Rock Field Office be conducted for Mr. McCoy (*Id.*, ¶ 28). Secretary Carson also claims that, in a response to an email requesting the geographic location he was interested in, Mr. McCoy advised Ms. Rizzo that he wanted to stay in Little Rock (Dkt. Nos. 18-2, at 45; 24, ¶ 28). With no citation to record evidence, Mr. McCoy denies these claims (Dkt. No. 24, ¶ 28).

Mr. McCoy received training materials on the Dragon voice recognition software and telephone training from the IT staff (*Id.*, ¶ 29). Mr. McCoy also had one-on-one live training from

Christopher Griffin from Eagle Collaborative Computer Services, Stafford, Virginia, on November 6 and 7, 2007 (*Id.*). Mr. Griffin ordered Mr. McCoy an ergonomic keyboard with a touchpad because he felt that Mr. McCoy would do better using a touchpad for a peripheral device (*Id.*). Mr. Griffin said that the noise level in Mr. McCoy's workplace did not interfere with the voice recognition software (*Id.*, ¶ 30). Mr. Griffin stated that as Mr. McCoy got more confident using the software the noise level fluctuation would become less of a factor (*Id.*). Mr. Griffin recommended that Mr. McCoy set aside two hours a day to self-practice the Dragon voice recognition software, and Mr. McCoy agreed to do this training (*Id.*).

Secretary Carson alleges that Mr. McCoy inquired of Mr. Griffin about the possibility of getting training on using keyboard shortcuts and mnemonics in Windows applications (Dkt. Nos. 18-2, at 48; 24, ¶ 31). Further, Secretary Carson alleges that Ms. Jackson emailed Mr. McCoy on November 14, 2007, informing him that Bruce Eubanks would provide him with training in the use of shortcuts for Microsoft Windows applications and could contact him directly to schedule the training (Dkt. Nos. 18-2, at 49; 24, ¶ 31). With no citation to record evidence, Mr. McCoy denies these allegations (Dkt. No. 24, ¶ 31).

On November 15, 2007, Mr. McCoy provided Ms. Jackson with a work status report from Dr. Chesser stating that he could do no keyboard work until further notice (*Id.*, ¶ 32). As a temporary response to address the work restriction, Ms. Jackson offered temporary typing assistance from a secretary in the legal department to Mr. McCoy so that he could complete his reports and assigned him to work at the Customer Service Desk for the afternoon of November 16, 2007, because the Customer Service Representative was on annual leave (*Id.*). Mr. McCoy did not accept the typing assistance (*Id.*). Ms. Jackson also asked Ms. Rizzo and Mr. Coop to provide assistance to Mr. McCoy and asked Mr. McCoy to coordinate his assistance needs with them (*Id.*).

On October 31, 2007, Ms. Jackson gave Mr. McCoy the work assignment to update the Congressional notebook in electronic form and requested that it be completed by December 7, 2007 (*Id.*, ¶ 37). On November 26, 2007, Mr. McCoy asked Ms. Jackson if she had an electronic copy, and she replied that same day that she did not (*Id.*). Mr. McCoy admits that this is a job normally assigned to him (*Id.*). Mr. McCoy stated that he did not have a problem being assigned to put the notebook together (*Id.*). Mr. McCoy completed the Congressional notebook on December 7, 2007 (*Id.*).

On January 8, 2008, Ms. Jackson met with Mr. McCoy, and Mr. McCoy presented her with a work status report from Dr. Chesser with the restrictions of no typing and no working with a computer mouse until after surgery on January 18, 2008 (*Id.*, ¶ 38). Mr. McCoy also provided a work status report from Dr. Thompson saying that he was scheduled for surgery on January 18, 2008, and would be off work two weeks until his post-operation appointment (*Id.*). Mr. McCoy also presented Ms. Jackson with leave slips for Leave Without Pay ("LWOP") for January 18, 2008, to March 1, 2008, which Ms. Jackson signed and returned to him (*Id.*).

Ms. Jackson sent Mr. McCoy an email confirming the conversations and events during their meeting (*Id.*, ¶ 39). Ms. Jackson advised Mr. McCoy that she was not currently expecting or requiring him to type or work with the computer mouse or perform any functions contrary to work restrictions provided by the doctors (*Id.*). But, if Mr. McCoy was at work, Ms. Jackson expected him to complete assignments she wanted completed, including: to complete the Quarterly Report (due January 16, 2008); to complete the Weekly Report (due January 11, 2008); to complete the Field Policy and Management ("FPM") Employee Work Plan (due January 11, 2008); and to follow up to determine the status of the response to email inquiries received regarding the Gorman Towers Apartment (*Id.*). The reports could be compiled by information sent to Mr. McCoy from

Program Managers and their staffs (*Id.*). All FPM employees were given the assignment to complete their work plan on November 27, 2007 (*Id.*). Ms. Jackson advised Mr. McCoy that failure to follow her directives may result in disciplinary action (*Id.*). Mr. McCoy responded to her email by stating that he could not do the work and was going to request sick leave from January 14, 2008, to January 17, 2008 (*Id.*).

According to Secretary Carson, Mr. McCoy's work status report was also sent to Ms. Rizzo (*Id.*, ¶ 33). Secretary Carson alleges that, on January 8, 2008, Ms. Rizzo sent Mr. McCoy's medical information again to the Federal Occupation Health for review and recommendation (Dkt. Nos. 18-2, at 54-55; 24, ¶ 33). Secretary Carson alleges that, on January 20, 2008, Dr. Cohen replied to Ms. Rizzo stating that she communicated with Mr. McCoy's treating physician, Dr. Chesser, and he indicated that there should be no restrictions on Mr. McCoy using his left hand and on an occasional basis while working the voice-activated software to perform his work (Dkt. Nos. 18-2, at 56-57; 24, ¶ 33). Secretary Carson claims that Dr. Chesser told Dr. Cohen that he had very positive feelings for the agency regarding the acquisition of this software to accommodate Mr. McCoy's medical conditions (Dkt. Nos. 18-2, at 57; 24, ¶ 33). Secretary Carson further claims that, based on this information, Dr. Cohen concluded that Mr. McCoy was already being accommodated properly with voice-activated software to perform his duties as an Operation Specialist and that any minimal keyboarding that may be required to use the program was approved by Dr. Chesser to be performed by Mr. McCoy's left hand (Dkt. Nos. 18-2, at 57; 24, ¶ 33). Thus, Secretary Carson alleges, Dr. Cohen stated that she could not support Mr. McCoy's request for accommodation of no keyboard work (Dkt. Nos. 18-2, at 57; 24, ¶ 33). With no citation to record evidence, Mr. McCoy denies these claims (*Id.*).

Mr. McCoy had his workstation evaluated again on May 13, 2008, by Sharon Buratowski from Northside Therapy Center at the request of Dr. Chesser and nurse Alma Adams (*Id.*, ¶ 40). The workstation evaluation recommended a new chair for Mr. McCoy that had more forearm support (*Id.*). Mr. McCoy received a new chair in August 2008 that met the features of his accommodation request (*Id.*). Mr. Coop also received an ergonomic chair as a reasonable accommodation (*Id., ¶* 41). The reasonable accommodation occurred prior to Ms. Jackson's appointment to the Little Rock Field Office, and she had no knowledge of the circumstances (*Id.*).

On February 26, 2008, Mr. McCoy filed an Equal Employment Opportunity ("EEO") complaint of discrimination alleging race, disability, sex, and reprisal discrimination (*Id.*, ¶ 13). Mr. McCoy named Ms. Jackson as the responsible party (*Id.*). The following issues were accepted for investigation from his EEO complaint: whether the agency discriminated against Mr. McCoy when the Little Rock Field Office Director denied his request for reasonable accommodation from March 21, 2007, continuing to the present; whether the agency discriminated against Mr. McCoy when the Little Rock Field Office Director issued Mr. McCoy a fully successful performance evaluation instead of outstanding for the rating period September 1, 2006, to September 30, 2007; and whether the agency subjected Mr. McCoy to continuing acts of harassment constituting a hostile work environment by assigning him work that is inconsistent with medical restrictions (*Id.*). Specifically, Mr. McCoy raised the assignment to update the Congressional notebook and work assignments discussed in a January 9, 2008, email he received from Ms. Jackson (*Id.*).

Mr. McCoy's EEO complaint was investigated (*Id.*, ¶ 14). On September 28, 2016, the United States Equal Employment Opportunity Commission ("EEOC") Administrative Judge Joseph Crout issued a decision without a hearing on the Agency's Motion for Summary Judgment finding that Mr. McCoy failed to prove that he was denied reasonable accommodations and that

he failed to make out a prima facie case on race, disability discrimination, or retaliation (*Id.*). The agency issued a Final Agency Decision on October 6, 2016, adopting EEOC Administrative Judge Crout's decision (*Id.*). On January 3, 2017, Mr. McCoy filed his complaint in this Court and amended his complaint on March 22, 2017 (*Id.*).

## II.    Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Incorporated v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56). Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial

burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

Importantly, "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010)). "Although employment discrimination cases are 'often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment.'" *Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 459 (8th Cir. 2011) (quoting *Fercello*, 612 F.3d at 1077). "An employer is entitled to judgment as a matter of law if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision." *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1047 (8th Cir. 2002) (internal quotations and citations omitted).

### III.     Alleged Disability Discrimination

Mr. McCoy states that, at all relevant times, he was disabled within the meaning of the term as defined by the ADA, and Mr. McCoy alleges that defendant violated the ADA in two actionable ways: discriminating against him via disparate treatment due to his disability and failing to make reasonable accommodations for his disability (Dkt. No. 2, ¶¶ 55-60). As an initial matter, the Court acknowledges defendant's argument that the term employer under the ADA does not include the federal government of the United States or a corporation wholly owned by the

government of the United States. *See* 42 U.S.C. § 12111(5)(B)(i). A federal agency, such as HUD, would not be deemed an employer under the ADA. *See id.* Instead, the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701, *et seq.*, prohibits the federal government from discriminating against an employee who has a disability. 29 U.S.C. § 794(a); *see also Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). However, "[t]he ADA and the RA are 'similar in substance' and, with the exception of the RA's federal funding requirement, 'cases interpreting either are applicable and interchangeable.'" *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (quoting *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998)); *see also Durand v. Fairview Health Servs.*, 902 F.3d 836, 841 (8th Cir. 2018) (same); *Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996) (noting that "the same basic standards and definitions are used under both Acts").

Secretary Carson correctly states that Mr. McCoy, as a federal employee, should have alleged his disability claims under the RA rather than the ADA (Dkt. No. 18, at 18). Regardless, the Court will assess the merits of Mr. McCoy's claims in ruling on the pending motion for summary judgment.[2] *See Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014) ("Discrimination under . . . the Rehabilitation Act encompasses both disparate treatment because of a disability and failure to provide reasonable accommodations to a qualified individual's known disability."). The Court will assess Mr. McCoy's disparate treatment claims and failure to accommodate claims in turn.

---

[2] The Court notes that, during and after trial, Mr. McCoy would have the option to "move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue," including the unpleaded issue that his cause of action arises under the RA rather than the ADA. Fed. R. Civ. P. 15(b)(2). Given this procedural option and the similarities between the RA and the ADA, the Court deems appropriate assessing the merits of Mr. McCoy's claims at this stage.

## A.    Disparate Treatment

The RA prohibits discrimination against any "otherwise qualified individual with a disability . . . *solely* by reason of her or his disability." 29 U.S.C. § 794(a) (emphasis added). "In disparate treatment cases, a similarly situated disabled individual is treated differently because of his disability than less- or non-disabled individuals[, and] [t]he key element is discriminatory intent." *Peebles*, 354 F.3d at 766 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)). For a disparate treatment claim, a "qualified individual with a disability must show that he has suffered 'an adverse employment action as a result of the disability.'" *Withers*, 763 F.3d at 1003 (quoting *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 482 (8th Cir. 2007)). "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir. 2008) (citing *Thomas v. Corwin*, 483 F.3d 516, 528 (8th Cir. 2007)), *abrogated by Torgerson v. City of Rochster*, 643 F.3d 1031 (8th Cir. 2011).

"[T]he familiar three-step *McDonnell Douglas* approach is applied where no direct evidence of discrimination is available." *Peebles*, 354 F.3d at 766. To establish a *prima facie* case of disparate treatment, a plaintiff must demonstrate that he or she: (1) has a disability; (2) is a qualified individual; and (3) has suffered an adverse employment action because of that disability. *Jeseritz v. Potter*, 282 F.3d 542, 546 (8th Cir. 2002). Upon establishing such a case, the burden shifts to the defendant to state a legitimate, nondiscriminatory reason for its action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). If the defendant meets that burden, the presumption of discriminatory action raised by the prima facie case is rebutted, and the plaintiff may respond by showing that the defendant's proffered reason was a pretext for the disparate treatment. *Id.*

Mr. McCoy claims that he was subject to disparate terms and conditions of his employment contract with defendant due to his perceived disability and his actual disability (Dkt. No. 2, ¶ 57). For the purposes of this motion for summary judgment, defendant concedes that Mr. McCoy meets his burden of proof to satisfy the first two elements of his disparate treatment claim (Dkt. No. 18, at 29). However, defendants contend that Mr. McCoy has not suffered an adverse employment action because of his disability (*Id.*, at 29-34).

In his EEO complaint, Mr. McCoy raised only his FY 2007 performance appraisal as an adverse action in his disability discrimination claim (Dkt. No. 18-3). Mr. McCoy "does not appear to have pursued any administrative action with respect to" any other alleged disparate treatment. *Ballard v. Rubin*, 284 F.3d 957, 964 n.6 (8th Cir. 2002). "Before the federal courts may hear a discrimination claim, an employee must fully exhaust her administrative remedies." *Burkett v. Glickman*, 327 F.3d 658, 660 (8th Cir. 2003). This exhaustion requirement extends to claims of disability discrimination brought under the RA. *See Morgan v. U.S. Postal Serv.*, 798 F.2d 1162, 1165 (8th Cir. 1986) ("[Plaintiff] is required to exhaust administrative remedies even though he filed suit under [the RA]."). In pursuing a disability-based discrimination claim, a federal employee must exhaust his administrative remedies by seeking [EEO] counseling within 45 days of the alleged discriminatory act. 29 C.F.R. § 1624.105(a)(1); *see also Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005). Since Mr. McCoy raised only the issue of his FY 2007 performance appraisal in his EEO complaint regarding disability discrimination, that issue is the only one he has properly exhausted in accordance with Title VII and the only alleged adverse action this Court will address.[3]

---

[3] Secretary Carson objects to Mr. McCoy being permitted to cite his five-day suspension as an adverse employment action in support of his disparate treatment claim, arguing that Mr. McCoy did not raise his five-day suspension in his EEO complaint and therefore failed to exhaust

Mr. McCoy received an overall fully successful rating and a fully successful rating on five critical elements on his performance appraisal for the period September 1, 2006, to September 30, 2007 (Dkt. No. 18-2, at 87-89). Ms. Jackson conducted this performance appraisal, and Deputy Regional Director Babers approved it (*Id.*, at 87). Ms. Jackson rated Mr. McCoy based on his self-assessment, the performance of his assigned duties and responsibilities as set forth in his job description, and the elements and standards issued to him for the FY 2007 performance cycle and special assignments (*Id.*, ¶ 20). Ms. Jackson also conducted a mid-year review with Mr. McCoy and gave him a fully successful rating (*Id.*). Mr. McCoy received overall fully successful ratings in his performance appraisals for FY 2006, FY 2005, and FY 2004, and Director Babers approved these performance appraisals, as well (*Id.*). Mr. McCoy did receive highly successful ratings in four critical elements in FY 2006 (*Id.*).

The Eighth Circuit has held that, standing alone, a poor "performance evaluation [is] not an adverse employment action." *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000). "A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment." *Id.* (citing *Cossette v. Minn. Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999); *Montandon v. Farmland Indus.*, 116

_____

his administrative remedies as to this action (Dkt. No. 18, at 31). Mr. McCoy does not cite his five-day suspension as an adverse employment action in his briefing (Dkt. No. 25). The Court agrees that Mr. McCoy failed to exhaust his administrative remedies as to the five-day suspension. Regardless, the Court determines that, based on the record evidence, performance issues were raised with Mr. McCoy beginning on February 24, 2003, again on May 14, 2007, and on September 14, 2007 (Dkt. No. 24, ¶¶ 34-35). With respect to the September 14, 2007, proposal for the suspension, Ms. Jackson put in writing the specifications upon which she relied to recommend suspension, Mr. McCoy was provided with notice and an opportunity to respond, and ultimately the decision of whether to suspend Mr. McCoy was reviewed and made by Mr. Ybarra, Supervisory Operations Officer (Dkt. No. 18-2, at 58-86). Defendant articulated legitimate, non-discriminatory reasons for the five-day suspension, and Mr. McCoy fails to show through record evidence that defendant's reasons were pretext and that discrimination was the real reason for the five-day suspension.

F.3d 355, 359 (8th Cir. 1997)). Rather, "[a]n unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Id.* (citing *Enowmbitang v. Seagate Tech., Inc.*, 148 F.3d 970, 973-74 (8th Cir. 1998); *Montandon*, 116 F.3d at 359). Here, Mr. McCoy makes no claim or showing that his fully successful performance rating had any effect on the terms or conditions of his employment, and he has "presented no evidence tending to show the [performance appraisal] was relied upon to effect any material change in the terms or conditions of his employment." *Hughes v. Stottlemyre*, 454 F.3d 791, 796-97 (8th Cir. 2006) (citing *Spears*, 210 F.3d at 854). The Court finds, therefore, that Mr. McCoy has not shown an adverse employment action, and his disparate treatment claim fails as a result.

Thus, for the above reasons, the Court grants defendant's motion for summary judgment as it pertains to Mr. McCoy's disparate treatment claims.

### B.    Failure To Accommodate

"In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Peebles*, 354 F.3d at 767. As the Eighth Circuit has held, an employer commits unlawful discrimination if the employer does not make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer. *See Ballard*, 284 F.3d at 960; *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(a)). "A reasonable accommodation should provide the disabled individual an equal employment opportunity, including an opportunity to attain the same level of performance,

benefits, and privileges that is available to similarly situated employees who are not disabled."

*Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (citation omitted).

"To determine the appropriate reasonable accommodation it may be necessary for the covered

entity to initiate an informal, interactive process with the individual with a disability in need of the

accommodation." 29 C.F.R. § 1630.2(o)(3). With a reasonable accommodation claim, "the

employer's intent is not determinative." *Withers*, 763 F.3d at 1004. "Rather, discrimination occurs

when the employer fails to abide by a legally imposed duty." *Peebles*, 354 F.3d at 767.

Unlike disparate treatment cases, reasonable accommodation claims do not fall under the

*McDonnell Douglas* burden-shifting analysis. *See Peebles*, 354 F.3d at 767. Instead, with a

reasonable accommodation claim, "the plaintiff's burden, upon a defendant's motion for summary

judgment, is only to show that the requested accommodation is 'reasonable on its face, *i.e.*,

ordinarily or in the run of cases.'" *Id.* at 768 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391,

401 (2002)). "Upon such a showing, the employer is left to 'show special (typically case-specific)

circumstances that demonstrate undue hardship in the particular circumstances.'" *Id.* (quoting

*Barnett*, 535 U.S. at 402). In practice, the Eighth Circuit has articulated a four-part test for

evaluating these claims, under which the plaintiff must demonstrate: "(1) the employer knew about

the employee's disability; (2) the employee requested accommodations or assistance for his or her

disability; (3) the employer did not make a good faith effort to assist the employee in seeking

accommodations; and (4) the employee could have been reasonably accommodated but for the

employer's lack of good faith." *Ballard*, 284 F.3d at 960 (internal quotations and citations

omitted).

Mr. McCoy contends that he was not provided with reasonable accommodations to perform

his work (Dkt. No. 25, at 14). Mr. McCoy alleges that defendant refused to make reasonable

accommodations for his disability by forcing him to perform typing and keyboarding that it knew would conflict with his health condition and violate of his doctor's recommendations, in direct violation of the ADA (Dkt. No. 2, ¶ 58). Mr. McCoy states that defendant delayed for an unreasonable amount of time in providing him with the necessary equipment in order for him to perform his job duties, despite being requested to do so by Mr. McCoy, his doctors, and his occupational therapist, in violation of the ADA (*Id.*, ¶ 59). Finally, Mr. McCoy asserts that defendant refused to engage in the interactive process once he made a request for a reasonable accommodation, in violation of the ADA (*Id.*, ¶ 60). For the purposes of his motion for summary judgment, Secretary Carson assumes that Mr. McCoy is a disabled individual under the meaning of the RA (Dkt. No. 18, at 19). However, Secretary Carson contends that HUD reasonably accommodated Mr. McCoy (Dkt. Nos. 18, at 19-28; 26, at 4-9). The undisputed record evidence, even with all reasonable inferences construed in favor of Mr. McCoy, supports Secretary Carson's contention.

On March 20, 2007, Mr. McCoy submitted an accommodation request stating that his doctor had instructed him to limit his time and usage on the computer for the next 30 days through April 12, 2007, because of pain and tremors in his hands (Dkt. No. 18-2, at 30-31). This accommodation request represented the first time that Ms. Jackson became aware of Mr. McCoy's problems with his hands (*Id.*, ¶ 7). Mr. McCoy admits that Ms. Jackson then engaged in interactive communications with Mr. McCoy to discuss the problem which affected his ability to perform the essential functions of his job and to determine an appropriate reasonable accommodation that would enable him to perform these functions (Dkt. No. 24, ¶ 19). Mr. McCoy also admits that he was unable to specify or describe a possible accommodation that would allow him to perform his essential functions (*Id.*, ¶ 20). Due to her lack of knowledge of the expense and availability of

appropriate reasonable accommodation to meet Mr. McCoy's needs, Ms. Jackson requested assistance from Ms. Leon and Ms. Rizzo in evaluating a reasonable accommodation for Mr. McCoy (*Id.*).

Ms. Rizzo asked Dr. Cohen to review the medical documentation provided by Mr. McCoy, and Dr. Cohen suggested voice recognition software as an accommodation to Mr. McCoy's treating physicians, Drs. Cain and Chesser (Dkt. No. 18-2, at 32-34). Drs. Cain and Chesser felt that this accommodation would adequately address Mr. McCoy's lack of fine motor skills at the time while still permitting Mr. McCoy to perform the essential functions of his job (*Id.*, at 33). As a result, Ms. Jackson approved the purchasing of Dragon software, a track ball, and an ergonomic keyboard for Mr. McCoy, and he received the Dragon software, track ball, ergonomic keyboard, headset, and related training materials sometime in mid-May 2007 (Dkt. Nos. 18-2, at 35; 24, ¶ 21). Dr. Chesser indicated that he had very positive feelings for HUD regarding the acquisition of the Dragon software to accommodate Mr. McCoy's medical conditions (Dkt. No. 18-2, at 57). In response to Mr. McCoy's work status report from Dr. Chesser dated November 15, 2007, Ms. Jackson offered Mr. McCoy temporary typing assistance from a secretary in the legal department, asked Ms. Rufus and Mr. Coop to provide assistance to Mr. McCoy, and assigned Mr. McCoy to work the customer service desk for an afternoon, a job that did not require typing (*Id.*, at 51-52). Ms. Jackson also approved Mr. McCoy's request for annual leave for November 19, 2007, through November 23, 2007 (*Id.*, at 52).

At his request, Mr. McCoy's workstation was evaluated on September 24, 2007 (Dkt. No. 24, ¶ 27). Following this evaluation, Ms. Rizzo wrote Mr. McCoy a memorandum of October 4, 2007, which detailed the recommendations stemming from the evaluation (*Id.*). The recommendations were to: determine if Mr. McCoy could be assigned to another job not requiring

the use of a computer or the need to write; require Mr. McCoy to use the voice recognition program already installed on his computer; replace the current mouse laptop keyboard with a RollerMouse Pro Workstation; provide large barreled gel pens; eliminate the use of the current chair and replace it with the modern chair already in Mr. McCoy's cubicle; and require Mr. McCoy not to place his left elbow directly on the rest by adjusting it so that the bottom of the forearm contacts the rest and his arm is kept as straight as possible (*Id.*). In addition, recommendations were made to Mr. McCoy that he utilize the Dragon software and Life chair that he had been provided (Dkt. No. 18-2, ¶ 12). Further still, Ms. Rizzo conducted a job search for Mr. McCoy for a position that did not require the use of a computer or the need to write (Dkt. No. 18-2, at 44-45). At Mr. McCoy's request, Ms. Rizzo only conducted a search for positions in Little Rock (*Id.*, at 45). Unfortunately, Ms. Rizzo could not locate a satisfactory position for Mr. McCoy (*Id.*, ¶ 13). In addition, Mr. McCoy's workstation was evaluated at least two other times, once in 2003 and once on May 13, 2008, and defendant acted in accordance with these evaluations (Dkt. Nos. 18-2, at 25; 18-8).

These facts demonstrate that defendant made reasonable accommodations for Mr. McCoy's disability, engaged in no delay in acquiring the necessary equipment for Mr. McCoy to do his job properly, and participated in the interactive process with Mr. McCoy and his physicians once he made requests for reasonable accommodations. Ms. Jackson, with the assistance of supervisors and input from Mr. McCoy's treating physicians, acquired software and equipment that would facilitate Mr. McCoy in carrying out the duties of his job. This software and equipment arrived a mere two months after Mr. Jackson submitted his accommodation request, and Ms. Jackson worked through appropriate channels quickly to accommodate Mr. McCoy. These facts, borne out by the undisputed record evidence, demonstrate that defendant reasonably accommodated Mr. McCoy.

Additionally, Mr. McCoy highlights the following events as proof of defendant's failure to accommodate reasonably his disability: (1) although Mr. McCoy received the Dragon voice recognition software in May 2007, he did not receive training on it until November 2007; (2) moving from a personal office to a cubicle surrounded by other workers made it difficult, if not impossible, to use the Dragon software due to the noise; (3) Mr. McCoy made numerous requests for an ergonomic chair but was not provided one; and (4) Mr. McCoy and his doctor made requests to have his workstation evaluated, as far back as May 11, 2007, but this evaluation did not occur until September 24, 2007 (Dkt. No. 25, at 14). The undisputed record evidence, even with all reasonable inferences drawn in favor of Mr. McCoy, does not support his contentions.

First, Mr. McCoy admitted that he received written training materials on the Dragon voice recognition software and telephone training from the IT staff (Dkt. No. 24, ¶ 29). In a May 14, 2007, email from Mr. McCoy to Jeffrey Staples, an Accessibility Specialist with the Assistive Technology Program, Mr. McCoy thanked Mr. Staples and the IT staff for the "patience and support" they had "provided [him] in addressing [his] work related typing problems and introducing [him] to Dragon NaturallySpeaking" (Dkt. No. 18-6, at 1). Mr. McCoy wrote that "the software is amazing and the training materials are excellent" (*Id.*). Mr. McCoy referenced a "training session" held that day and mentioned that "it would be good for [him] to integrate a 'Tape Recorder' into [his] training" (*Id.*). Mr. McCoy's own words indicate that he received training on the Dragon voice recognition software at least as early as May 2007, undercutting this contention as a basis for his reasonable accommodation claim.

Second, Mr. Griffin's report from his visit to the HUD Little Rock Field Office in order to provide technical support and training to Mr. McCoy quells the concerns about using the software in a cubicle environment (Dkt. No. 18-2, at 47-48). Mr. Griffin's training session covered

extensive ground, and Mr. Griffin reported that at the end of the training session Mr. McCoy felt that his ability in using Dragon had grown and that he was very appreciative of the one-on-one training he received (*Id.*). Mr. Griffin did observe that the noise level surrounding Mr. McCoy's cubicle would at times fluctuate to a point that could be deemed a distraction, but the time length of the distractions would last for only a few minutes (*Id.*, at 47). Importantly, Mr. Griffin stated that the noise level itself did not appear to interfere with the Dragon software (*Id.*). Mr. Griffin encouraged Mr. McCoy to continue to train on Dragon and stated that, as he became more confident using the software, the noise level fluctuation would become less of a factor (*Id.*). Mr. McCoy admits that these were Mr. Griffin's findings, and Mr. McCoy also admits that he agreed to set aside two hours a day to self-practice the Dragon voice recognition software (Dkt. No. 24, ¶ 30).

Third, despite Mr. McCoy's argument that he made numerous requests for an ergonomic chair but was not provided one, Mr. McCoy admits that he received at least three ergonomic chairs during his employment in the Little Rock HUD Field Office (Dkt. No. 24, ¶¶ 16, 26, 40). The only accommodation request for a new chair that was denied occurred in 2006 when Mr. McCoy submitted an accommodation request for a replacement chair because the left armrest on his chair broke (Dkt. Nos. 18-1, at 30-31; 24, ¶ 17). Instead of ordering a new chair at that time, the agency replaced the broken arm on Mr. McCoy's ergonomic chair (Dkt. Nos. 18-1, at 32-34; 18-2, at 28-29; 24, ¶ 17). Mr. McCoy admits that he verified with Ms. Jackson that his chair was repaired on October 4, 2006 (Dkt. No. 24, ¶ 17). "[A]n employer is not required to provide a disabled employee with an accommodation that is ideal from the employee's perspective, only an accommodation that is reasonable." *Huber*, 486 F.3d at 484 (citing *Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1019 (8th Cir. 2000)). Since Mr. McCoy made this

accommodation request due to the broken armrest, the Court considers defendant replacing the armrest and repairing Mr. McCoy's chair a reasonable accommodation.

Fourth, the Court does not consider the time elapsed between Mr. McCoy's request that his workstation be evaluated and the evaluation itself to be unreasonable or to demonstrate that defendant did not reasonably accommodate Mr. McCoy. Some courts have considered delay a failure to participate in good faith in the interactive process. *See, e.g., Scheer v. City of Cedar Rapids*, 956 F. Supp. 1496, 1501 (N.D. Iowa 1997). The record evidence does not support such an allegation here. Mr. McCoy admits that he wrote Ms. Rizzo on May 14, 2007, requesting that a professional evaluate his workstation because his new keyboard and mouse may have been doing him more harm than good (Dkt. No. 24, ¶ 23). On June 11, 2007, Mr. McCoy submitted an accommodation request that, in part, requested that his workstation be evaluated so his doctor could fully evaluate and treat his medical conditions (*Id.*). Mr. McCoy admits that, during this time, Ms. Jackson engaged in interactive communications with him to discuss the problem that affected his ability to perform the essential functions of his job and to determine an appropriate reasonable accommodation that would enable him to perform these functions (Dkt. No. 24, ¶ 24). Due to her lack of knowledge of the expense and availability of an appropriate reasonable accommodation to meet Mr. McCoy's needs, Ms. Jackson sent the accommodation request to Ms. Rizzo for evaluation and determination (Dkt. Nos. 18-2, ¶ 7; 24, ¶ 24). However, in July 2007, just one month later, the entire Little Rock HUD Field Office moved to another floor (Dkt. No. 24, ¶ 26). This move included Mr. McCoy moving from an office on the prior floor to a cubicle on the new floor (*Id.*). A thorough workstation evaluation occurred two months after the move (Dkt. Nos. 18-5; 24, ¶ 27). The Court agrees with defendant that an evaluation of Mr. McCoy's

workplace before his move would not have been helpful given the changes to his workplace that accompanied the move.

The Court notes that "[w]hat is reasonable" in terms of a reasonable accommodation "depends on the totality of the circumstances." *Sturgill v. U.S. Post. Serv.*, 512 F.3d 1024, 1030 (8th Cir. 2008). The record shows that defendant provided Mr. McCoy with the following accommodations: ergonomic chairs, ergonomic keyboards, track ball, headset, large barreled gel pens, training materials, Microsoft shortcut training, workplace evaluations, typing assistance, assistance from Ms. Rufus and Mr. Coop, a job search for another position in Little Rock as requested by Mr. McCoy, Dragon software, and training on the Dragon software. The totality of the circumstances based on the undisputed record evidence demonstrates that defendant reasonably accommodated Mr. McCoy in accordance with the RA. The Court determines based on the record evidence that, even with all reasonable inferences drawn in favor of Mr. McCoy, no reasonable juror could come to a contrary conclusion. The Court grants defendant's motion for summary judgment on Mr. McCoy's reasonable accommodation claims.

## IV. Race Discrimination

Title VII prohibits an employer from discriminating against an individual in the employment context, stating:

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

A plaintiff's race discrimination claim can survive a motion for summary judgment in one of two ways. *See Humphries v. Pulaski Cty. Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009). First, a plaintiff "may present admissible evidence directly indicating unlawful discrimination, that is, evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 863 (8th Cir. 2008). Alternatively, a plaintiff "may present evidence 'creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas*.'" *Humphries*, 580 F.3d at 692 (quoting *Fields,* 520 F.3d at 863-64). Evidence of a Title VII violation is direct if it "establishes 'a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the employer's decision." *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (quoting *Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir. 1997)). Since Mr. McCoy does not advance direct evidence in support of his race discrimination claim, the Court considers his claim under the *McDonnell Douglas* framework.

To establish a *prima facie* claim of race discrimination under the *McDonnell Douglas* framework, a plaintiff "must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (citations omitted). A plaintiff may show such an inference of discrimination "by showing that a similarly-situated person of another race received more

favorable treatment," though "[t]hat person must be similarly situated in all relevant aspects." *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019) (internal quotations and citations omitted). "If a plaintiff satisfies this burden, the defendant then has the burden of showing a legitimate, non-discriminatory reason for the challenged action." *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (citing *Putman*, 348 F.3d at 735). "If the defendant offers such a reason, the burden shifts back to the plaintiff to show the defendant's proffered reason is a pretext." *Id.* (citing *Putman*, 348 F.3d at 735).

Mr. McCoy alleges that he was discriminated against due to his race in violation of Title VII and was subjected to disparate treatment when Caucasian co-workers were afforded more favorable treatment than he was (Dkt. Nos. 2, ¶¶ 61-67; 25, at 11). Specifically, Mr. McCoy alleges that Mr. Coop also suffers from a disability and was treated more favorably (*Id.*, ¶ 62). Mr. McCoy claims that Mr. Coop, upon request, was immediately provided with an expensive ergonomic chair due to his disability and that Mr. Coop was not required to perform any extensive typing or keyboarding as an accommodation to his physical limitations (*Id.*, ¶¶ 64-65). Mr. McCoy claims that, despite the fact that he made similar requests, his requests were not met and/or were unreasonably delayed on account of his race (*Id.*, ¶ 66). Further, Mr. McCoy asserts that, unlike himself, Mr. Coop is not required to spend 95% of his time typing (Dkt. No. 25, at 11). Finally, the record indicates that Mr. Coop received better performance appraisals than Mr. McCoy in FY 2006 and 2007 (Dkt. Nos. 18-2, ¶ 20). Thus, Mr. McCoy alleges that he was provided less favorable terms and conditions of employment on account of his race than a Caucasian co-worker (Dkt. No. 2, ¶ 67).

Mr. McCoy fails to establish a *prima facie* case of racial discrimination. Mr. McCoy admits that he received at least three ergonomic chairs during his tenure at HUD (Dkt. No. 24, ¶¶ 16, 26,

40).  Mr. McCoy received the first ergonomic chair in partial response to a prior reasonable accommodation request sometime during 2003 (Dkt. No. 18-1, at 29-31; 18-2, at 18-20, 25).  On August 15, 2006, Mr. McCoy submitted an accommodation request for a replacement chair because the left armrest on his chair broke (Dkt. Nos. 18-1, at 30-31; 24, ¶ 17).  Instead of purchasing a replacement chair, a replacement arm was ordered, Mr. McCoy's chair was repaired, and Mr. McCoy verified that the chair was repaired on October 4, 2006 (Dkt. Nos. 18-1, at 32-34; 18-2, at 28-29; 24, ¶ 17).  Mr. McCoy and all other employees received new ergonomic chairs in July 2007 when the Little Rock HUD Field office moved to another floor in their building (Dkt. Nos. 18-2, ¶ 11; 24, ¶ 26).  This second chair was a Life chair, which had several features including adjustable lumbar support, adjustable arms, adjustable seat height and depth, and a tension preference selector (Dkt. No. 24, ¶ 26).  Mr. McCoy received the third ergonomic chair following a May 13, 2008, workstation evaluation (Dkt. Nos. 18-8; 24, ¶ 40).  The workstation evaluation recommended a new chair for Mr. McCoy that had more forearm support (Dkt. No. 24, ¶ 40).  Mr. McCoy received a new chair in August 2008 that met the features of his accommodation request (Dkt. Nos. 18-7; 24, ¶ 40).  The record evidence shows that Ms. Jackson approved and fulfilled Mr. McCoy's requests for ergonomic chairs in a reasonable and timely fashion and does not support a disparate treatment claim.

Though the Court sees no difference between how defendant accommodated Mr. McCoy's requests for an ergonomic chair and Mr. Coop's requests for an ergonomic chair, the Court also notes that Mr. McCoy and Mr. Coop are not similarly situated individuals as it relates to the ergonomic chairs because Ms. Jackson did not approve the purchase of Mr. Coop's chair (Dkt. No. 26, at 2).  Mr. McCoy admits that Mr. Coop received an ergonomic chair prior to Ms. Jackson's appointment to the Little Rock HUD Field Office and that Ms. Jackson had no knowledge of the

circumstances surrounding Mr. Coop's receipt of the chair (Dkt. No. 24, ¶ 41). The Eighth Circuit has held that employees are not similarly situated or comparable when two different decisionmakers are involved in the challenged actions. *See Xuan Huynh v. U.S. Dep't of Transp.*, 794 F.3d 952, 960 (8th Cir. 2015) (granting defendant's motion for summary judgment on plaintiff's claim of racial discrimination for denying him a transfer since plaintiff's request for transfer was denied by different supervisor than the supervisors that granted plaintiff's coworkers' requests for transfer); *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) ("[I]ndividuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."); *Fields*, 520 F.3d at 864-65 (finding plaintiff not similarly situated to coworker when plaintiff and coworker had different supervisors and reported to different decisionmakers); *Jones v. Frank*, 973 F.2d 673, 676-77 (8th Cir. 1992) (holding that plaintiff was not comparable to other individuals who had been reinstated by a different supervisor than the supervisor with authority to reinstate plaintiff). Because different decisionmakers handled Mr. McCoy's and Mr. Coop's respective requests for ergonomic chairs, they are not similarly situated on this issue for purposes of a race discrimination analysis.

Next, the Court considers Mr. McCoy's claim that Ms. Jackson required him to perform extensive typing and keyboarding while not requiring such work from Mr. Coop. Mr. McCoy did not raise this argument in his EEO complaint (Dkt. No. 18-3). As such, Mr. McCoy failed to exhaust this race discrimination claim, and the Court would be right to dismiss this claim on that basis alone. *See* 42 U.S.C. §§ 2000e-5(e)(1), 2000e-16 (outlining Title VII's exhaustion requirement prior to filing a civil action); *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850-

51 (8th Cir. 2012) (finding that district court correctly dismissed Title VII claim due to plaintiff's failure to exhaust claim).

Even on the merits, defendant is entitled to summary judgment on this claim. The Court first notes that, though Ms. Jackson determined that 90% to 95% of Mr. McCoy's work product required use of the computer, Mr. McCoy testified that only 40% to 45% of his work product required computer use (Dkt. Nos. 18-1, at 35-36; 24, ¶ 19). In fact, Mr. McCoy called the suggestion that even 90% of his work required use of the computer "ridiculous" and that the 90% to 95% determination was too high (Dkt. No. 18-1, at 36). Mr. McCoy also testified that Mr. Coop did job duties like Mr. McCoy's including preparing quarterly management reports, briefings, and other reports (*Id.*, at 14-16). Therefore, the record suggests that Mr. McCoy's job did not require extensive typing and keyboarding in a way different from Mr. Coop's job. Instead, Mr. McCoy's claim appears to "revolve primarily around his dissatisfaction with his work responsibilities." *Duffy v. McPhillips*, 276 F.3d 988, 992 (8th Cir. 2002). However, "not everything that makes an employee unhappy is an actionable adverse action." *Bechtel v. City of Belton, Mo.*, 250 F.3d 1157, 1162 (8th Cir. 2001) (quoting *Montandon*, 116 F.3d at 359). Mr. McCoy's dissatisfaction with the elements of his job that require typing or keyboarding does not constitute an adverse action, and Mr. McCoy fails to show on the record evidence that he and Mr. Coop faced different working requirements in this regard.

As to the evaluations, although defendant addresses this in its briefing as a basis for Mr. McCoy's race discrimination claim (Dkt. No. 18, at 35), Mr. McCoy does not (Dkt. No. 25). To the extent Mr. McCoy intends to rely upon evaluations to claim disparate treatment based on race, for the reasons previously explained, the record does not support that these evaluations were adverse employment actions. Record evidence also demonstrates that defendant offers a

legitimate, nondiscriminatory reason why Mr. McCoy and Mr. Coop's evaluations in FY 2007 differed, and Mr. McCoy fails to show through record evidence that defendant's legitimate, nondiscriminatory reason is false and that race was the real reason for the difference in performance appraisals.

Thus, for the above reasons, the Court grants defendant's motion for summary judgment on Mr. McCoy's race discrimination claims.

## V.    Retaliation

"Title VII forbids an employer from 'discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 818 (8th Cir. 2017) (quoting 42 U.S.C.§ 2000e-3(a)).  To establish a retaliation claim under Title VII, "a plaintiff must first establish a prima facie case by showing that he or she: '(1) engaged in statutorily protected activity; (2) he [or she] suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity.'" *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005) (quoting *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003)).  "[T]he threshold of proof necessary to establish a *prima facie* case is minimal." *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998) (citations omitted).  "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013).  "Even at summary judgment, '[a] plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events.'" *Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 373 (8th Cir. 2017)

(quoting *Turner v. Gonzales*, 421 F.3d 688, 696-97 (8th Cir. 2005)).  However, "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."  *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004) (quoting *Kiel*, 169 F.3d at 1136 (en banc)).

Mr. McCoy alleges that he suffered retaliation in response to his complaint about discrimination to the EEO and OSHA (Dkt. No. 2, ¶¶ 68-83).  Mr. McCoy submitted a complaint to OSHA on June 18, 2007, regarding alleged problems in having his reasonable accommodations requests met (*Id.*, ¶ 69).  In response to this complaint, Paul Hansen, an Area Director for OSHA, sent a letter to HUD on June 18, 2007, instructing HUD to investigate Mr. McCoy's alleged complaints and to report back to OSHA no later than June 26, 2007, detailing the results of the investigation (Dkt. Nos. 2, ¶ 70; 18-2, at 41-42).  Mr. McCoy alleges that, on or about October 12, 2007, he received a performance appraisal of "fully successful," when, in times past, he had received higher performance appraisals (Dkt. No. 2, ¶ 71).  Furthermore, Mr. McCoy alleges that he was provided training under the threat of disciplinary action from Ms. Jackson and that this training further aggravated his medical condition (*Id.*, ¶¶ 72-73).  On November 9, 2007, Mr. McCoy consulted with an EEO Counselor about the discriminatory treatment alleged (*Id.*, ¶ 74).  Mr. McCoy alleges that Ms. Jackson continued to provide him with assignments that required extensive typing and short deadlines which violated Mr. McCoy's doctor's orders, including a November 25, 2007, directive to complete the Congressional notebook by December 7, 2007 (*Id.*, ¶¶ 75-76).  Mr. McCoy states that the agency accepted his complaint of discrimination and hostile work environment on or around May 5, 2008 (*Id.*, ¶ 77).  Mr. McCoy received a five-day suspension in November 2007 (*Id.*, ¶ 78).  Mr. McCoy alleges that the above acts of retaliation

came as a "direct result" of complaining about discrimination to the EEO and OSHA and were designed to punish him for having complained, all in violation of Title VII (*Id.*, ¶ 79).

As an initial matter, defendant asserts that Mr. McCoy failed to exhaust his administrative remedies with respect to these allegations because he did not raise them in his EEO complaint in the context of his retaliation claim (Dkt. No. 18, at 37). Further, the Court notes that the parties disagree as to whether Mr. McCoy's OSHA complaint constitutes "protected activity" within the meaning of Title VII and as to whether Mr. McCoy suffered adverse employment actions for which defendant can show no legitimate nondiscriminatory reasons.

The Court need not rule on these disagreements, as the Court determines that on the undisputed record evidence Mr. McCoy has failed to show a causal connection between the alleged adverse employment actions and the alleged protected activity (Dkt. No. 26, at 11). Mr. McCoy submitted his complaint to OSHA on June 18, 2007 (Dkt. No. 18-2, at 41-42; Dkt. No. 24, ¶ 25). Ms. Jackson issued the proposal to suspend Mr. McCoy for five days on September 14, 2007 (Dkt. No. 24, ¶ 35). The performance appraisal in question occurred on October 12, 2007 (Dkt. No. 18-2, at 87-89). Ms. Jackson arranged for and informed Mr. McCoy of the Dragon training with Mr. Griffin on October 24, 2007, and the training occurred on November 6 and 7, 2007 (Dkt. No. 18-2, at 46-48). Mr. McCoy received the job assignment to update the Congressional notebook in electronic form on October 31, 2007 (Dkt. No. 24, ¶ 37). Mr. Ybarra suspended Mr. McCoy on November 5, 2007 (Dkt. No. 18-2, at 83-86).

Mr. McCoy correctly notes that "temporal proximity rises in significance the closer the adverse activity occurs to the protected activity." *Kohler Co.*, 335 F.3d at 774. However, "[a]s more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation." *Tyler v. Univ. of Ark. Bd.*

*of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) (citing *Sims v. Sauer-Sundstrand Co.*, 130 F.3d 341, 343 (8th Cir. 1997)).  Almost three months elapsed between the OSHA complaint and the first alleged retaliatory act, Ms. Jackson's proposed suspension.  The Eighth Circuit has "held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim, *see Kipp v. Missouri Highway and Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002), and that a two-week interval was 'sufficient, but barely so,' *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)."  *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006).  Here, as in *Lewis*, Mr. McCoy has "failed to provide any additional evidence of a causal link" between his OSHA complaint and the alleged retaliatory actions he suffered, and the temporal gap is insufficient to support Mr. McCoy's claim.  *See id.*

Mr. McCoy's also fails to establish a causal connection between the alleged adverse employment actions taken against him and his consultation with an EEO counselor on November 9, 2007, since this consultation occurred *after* almost all of the alleged retaliatory acts.  The November 25, 2007, directive to complete the Congressional notebook by December 7, 2007, is the only alleged adverse employment action that occurred after Mr. McCoy complained to the EEO.  However, Mr. McCoy testified to the following facts in his deposition:  Ms. Jackson gave Mr. McCoy the Congressional notebook assignment on October 31, 2007; there was nothing wrong with Ms. Jackson giving Mr. McCoy that assignment; that job would normally be assigned to Mr. McCoy; Ms. Jackson asked about the status of the assignment on November 25, 2007, and asked Mr. McCoy to have the assignment completed no later than December 7, 2007; and there was nothing wrong with Ms. Jackson asking Mr. McCoy to have the assignment completed by December 7, 2007 (Dkt. No. 18-1, at 44-45).  The Court is unconvinced that a supervisor asking an employee to complete a previously-assigned task by a certain date constitutes adverse

employment action, particularly when considered in the light of the facts Mr. McCoy admitted at his deposition. Moreover, this record evidence, even with all reasonable inferences construed in favor of Mr. McCoy, fails to establish a causal connection sufficient to support his retaliation claim.

Moreover, as previously explained, defendant offered legitimate, nonretaliatory reasons for each of these actions, and Mr. McCoy fails to demonstrate through record evidence that these reasons are pretext and that retaliation was the but-for reason.

Therefore, the Court grants defendant's motion for summary judgment on Mr. McCoy's retaliation claims.

## VI. Conclusion

For these reasons, the Court grants defendant's motion for summary judgment on Mr. McCoy's disability discrimination, failure to accommodate, race discrimination, and retaliation claims (Dkt. No. 17). The Court denies Mr. McCoy the relief he seeks, and his claims are dismissed with prejudice. Judgment will be entered accordingly.

So ordered this 4th day of December, 2019.

Kristine G. Baker
United States District Judge